DECISION
Before this Court is GTE Reinsurance Company Limited's (GTE RE) motion for an order confirming the vote at the November 30, 2010 Meeting of Creditors and implementing its proposed commutation plan, as well as Clearwater Insurance Company (f/k/a Odyssey Reinsurance Corporation and Skandia America Reinsurance Corporation) (Clearwater) and Hudson Insurance Company's (Hudson) (collectively, Odyssey Insureds) objections thereto. The Odyssey Insureds, as creditors of GTE RE, challenge the constitutionality of the Voluntary Restructuring of Solvent Insurers Act, G.L. 1956 § 27-14.5-1, et seq. (Restructuring Act) alleging violations of the Contract Clause and Due Process Clause of the United States and Rhode Island Constitutions. The Attorney General, Peter F. Kilmartin (Attorney General Kilmartin), participated in the instant proceedings as amicus curiae, and the Rhode Island Department of Business Regulation (DBR) joined the proceedings as an Intervenor.
 I The Restructuring Act[1]
On August 25, 1995, Governor Lincoln Almond (Governor Almond) created, by executive order (Executive Order), the Governor's Insurance Development Task Force *Page 2 
(Task Force).[2] See R.I. Exec. Order 95-21 (Aug. 22, 1995). In the Executive Order, Governor Almond made the following findings:
 "WHEREAS, the creation of jobs and investment in the State of Rhode Island through business expansion and recruitment is of the highest importance; and
 "WHEREAS, the financial services industry, which includes insurance . . . has been identified as a major target for greater development because it supports creation of a wide range of good jobs and new investment with minimal environmental impact; and
 "WHEREAS, Rhode Island has demonstrated itself to be a competitive location for several highly successful firms in the financial services industry and has modernized key aspects of its insurance laws in the recent years." Id.
In view of that, Governor Almond ordered that the Task Force "be established to develop a legislative and regulatory agenda to establish Rhode Island as a highly competitive state in which to domicile companies in one or more segments of the insurance industry." Id. The Task Force was charged with:
 "C. Identify[ing] the specific legal and regulatory barriers to insurance industry expansion in Rhode Island which can be corrected through legislative or regulatory action; and
 "D. Develop[ing] specific legislation, in consultation with industry experts, regulators, leadership in the General Assembly, and *Page 3 
economic developers, designed to position Rhode Island as the most competitive United States location for one or more target segments of the insurance industry." Id.
In 2002, in response to the Task Force's findings and recommendations, the Rhode Island Legislature enacted the Restructuring Act. The Restructuring Act became effective in 2004, following the promulgation of Insurance Regulation 68 (Reg. 68) by the Insurance Division of the DBR. The Restructuring Act, amended in 2007, sets forth a scheme by which a solvent insurance or reinsurance[3] company in run-off[4] may propose a commutation plan[5] extinguishing its liabilities for past and future claims of its creditors and then terminate its business. *Page 4 
Reg. 68 "outline[s] the procedural requirements for insurance companies applying for the implementation of a Commutation Plan."[6] See Reg. 68 § 2. It specifies that before a commercial run-off insurer[7] may seek court approval and implementation of its proposed commutation plan, the Applicant must first submit the plan for DBR review.[8] Id. § 4. Thereafter, DBR has sixty days to review and comment on the proposed commutation plan. Id. Only after an Applicant has addressed DBR's comments, or the sixty day period has expired, may an Applicant apply to this Court for an order calling for a Meeting of Creditors and designating classes of creditors, if any, for the purposes of that meeting.[9] Id.
Within ninety days of the submission of an application to this Court, a Meeting of Creditors shall be held to consider the proposed commutation plan. Notice of the meeting shall be provided to all known creditors or representatives of creditors in accordance with § 27-14.5-3.[10] *Page 5 
All creditors must be given an opportunity to vote on the proposed commutation plan and to object to this Court following a vote.See § 27-14.5-4(b). To obtain approval of the proposed commutation plan, an Applicant must obtain consent from (1) fifty percent of each class of creditors; and (2) seventy-five percent in value of the liabilities owed to each class of creditors.Id.
To determine whether the requisite statutory majority has been obtained, "votes will be calculated according to the aggregate amount of claims specified against the Applicant in respect of insurance and reinsurance contracts detailed in the voting form."See Reg. 68 § 4(c). Those creditors who fail to submit voting or proxy forms in accordance with the requirements of the commutation plan will not be considered to determine value of each creditor's vote at the Meeting of Creditors. Id. Further, the value attributed to each creditor's claim for voting purposes shall be determined on the basis of the information provided by the creditor in its *Page 6 
voting form or information available to the Applicant from its existing records. Id. Where an agreement cannot be reached as to the appropriate value of a creditor's claim, for voting purposes only, the Chairman of the Meeting of Creditors shall determine the fair and reasonable value.[11] Id. § 4(d).
Within thirty days of the approval of the proposed commutation plan, an Applicant must petition the Court to enter an order confirming the approval. Id. § 4(e). Before confirming the proposed plan and issuing an implementation order, the Court must determine that "implementation of the commutation plan would not materially adversely affect either the interests of the objecting creditors or the interests of assumption policyholders." Sec. 27-14.5-4(c). Upon such a determination, the Court must issue an implementation order which shall: "(i) Order implementation of the commutation plan;
 "(ii) Subject to any limitations in the commutation plan, enjoin all litigation in all jurisdictions between the Applicant and creditors other than with the leave of the court;
 "(iii) Require all creditors to submit information requested by the bar date specified in the plan;
 "(iv) Require that upon a noticed application, the Applicant obtain court approval before making any payments to creditors other than, to the extent permitted under the commutation plan, payments in the ordinary course of business, this approval to be based upon a showing that the Applicant's assets exceed the payments required under the terms of the commutation plan as determined based upon the information submitted by creditors under paragraph (iii) of this subdivision; *Page 7 
 "(v) Release the Applicant of all obligations to its creditors upon payment of the amounts specified in the commutation plan;
 "(vi) Require quarterly reports from the Applicant to the court and commissioner regarding progress in implementing the plan; and
 "(vii) Be binding upon the Applicant and upon all creditors and owners of the Applicant, whether or not a particular creditor or owner is affected by the commutation plan or has accepted it or has filed any information on or before the bar date, and whether or not a creditor or owner ultimately receives any payments under the plan." Sec. 27-14.5-4(c)(2).
Throughout the implementation period, an Applicant is required to make "quarterly reports to [DBR] regarding implementation and administration of the Commutation Plan." See
Reg. 68 § 4(f). Additionally, the Applicant is required to advise the Court of the completion of the commutation plan.See § 27-14.5-4(d); see also Reg. 68 § 4(g). The Court shall then issue an order either discharging the Applicant from the proceeding without further liability or dissolving the Applicant.Id. Any residual assets are distributed to the Applicant's owners. Id.
In exchange for the State's administration of a commutation plan, the Applicant is required to pay an administrative fee to the DBR in the amount of $125,000, "or any lesser amount that the commissioner shall deem adequate for appropriate and thorough review of the application." Sec. 27-14.5-5(a); see also Reg. 68 § 5(a). Additionally,
 "[e]very March 15, the commissioner shall assess each run-off insurer an amount equal to the greater of: (i) one thousand dollars ($1,000), or (ii) the sum of that run-off insurer's proportionate share of estimated regulatory expenditure for that calendar year and that run-off insurer's assessment deficit, less its assessment surplus." Sec. § 27-14.5-5(b)(1).
The calculation of the assessment surplus or deficit shall reflect the total cost of any examinations, and shall include the following expenses: (1) 150% of the total salaries and benefits paid to the examining personnel of DBR engaged in those examinations; (2) all *Page 8 
reasonable technology costs related to the examination process; and (3) all necessary and reasonable education and training costs incurred by the state to maintain the proficiency. Id.
 II Facts and Travel
GTE RE was incorporated in Bermuda on July 28, 1976 as a captive insurer and reinsurer of GTE Corporation. See Commutation Plan § 1.3. From 1978 through 1989, GTE RE also reinsured third-party property and casualty risks of U.S. and international insurance organizations, first as Telect Insurance Company Ltd., and then under its present name. Id. GTE RE "ceased underwriting in 1990, and . . . has been in [run-off] since that time."Id. In 1994, GTE RE moved its domicile to Vermont and on June 24, 2010, redomiciled in Rhode Island.
Between 1980 and 1986, GTE RE entered into several reinsurance contracts with the Odyssey Insureds.[12] See Wakin Affidavit ¶ 1. Specifically, on or about September 15, 1981, GTE RE's predecessor executed a continuous quota share reinsurance treaty with Hudson effective from December 31, 1980 through December 31, 1985 (Hudson Treaty).[13]Id. ¶ 2. Under Article II of the Hudson Treaty, GTE RE remained liable for its proportionate share of all losses that occurred during the period of its participation as a reinsurer on the Hudson Treaty. Id. GTE RE's share of the Hudson treaty was 4.5% for the years 1981 and 1982, 9% in 1983, 10% in 1984, and 15% in 1985. See Toothman Rebuttal Actuarial Report 13.
Similarly, on or about January 30, 1985, GTE RE's predecessor executed a continuous quota share reinsurance treaty with Clearwater effective from January 1, 1984 through January 1, 1987 *Page 9 
(Clearwater Treaty).[14] See Wakin Affidavit ¶ 4. Under the Clearwater Treaty, GTE RE also remained liable for all losses occurring prior to January 1, 1987. Id. GTE RE's share of the Clearwater Treaty was 2% in each year. See Toothman Rebuttal Actuarial Report 13.
The instant matter arises out of GTE RE's proposed commutation plan (Commutation Plan). Under its Commutation Plan, GTE RE would now make lump sum payments to each of its creditor-policyholders — rather than wait for claims to arise in the future — in exchange for which GTE RE would be released of all liabilities remaining under its contracts. Id. at 4.
Pursuant to Reg. 68 § 4, GTE RE submitted its Commutation Plan to DBR for review. DBR reviewed the plan for both procedural and substantive compliance with the requirements of the Restructuring Act and implementing regulations. See Dwyer Affidavit ¶¶ 5-6. As part of its review, DBR reviewed over half a dozen drafts of the Commutation Plan, focusing on the plan's effect on creditors, GTE RE's financial proposal, and the dispute resolution procedure. Id. ¶ 5. Additionally, DBR considered: (1) whether the drafting was clear and logical; (2) whether the interests of creditors were sufficiently close for there to be one class of creditors; (3) whether the notice to creditors was appropriate; (4) whether voting procedures methodologies were appropriate; (5) how the Meeting of Creditors and voting was going to be conducted; (6) whether the bar date was sufficiently long; and (7) whether the adjudication procedure was fair. Id. ¶ 6.
DBR also spent considerable time examining the fairness of the Commutation Plan's financial terms to creditors.Id. ¶ 7. Specifically, DBR commissioned an actuarial review to: (1) consider the reasonableness of GTE RE's carried reserves related to agreements subject to the Commutation Plan; (2) test the percentage of cedents with no activity over the last several years; *Page 10 
(3) assess the reasonableness of the composite reserve calculation from which initial settlement values are calculated; (4) estimate the total expected costs that GTE RE would face as a result of the Commutation Plan; and (5) assess the reasonableness of the Commutation Plan as it relates to the amounts to be paid to individual creditors. Id. ¶ 7.
DBR's actuary determined: (1) the historical data used in GTE RE's actuarial report was consistent with the historical experience by treaty; (2) the estimated total reserves for the exposures subject to the Commutation Plan were reasonable and conservative; (3) the composite reserve formula was reasonable and conservative in the aggregate; and (4) there was a sufficient adjudicatory process for cedents who object to the composite reserve formula settlements to provide additional or different information to justify different payments under the Commutation Plan. Id. ¶ 8.
Following its investigation and analysis of the Commutation Plan, DBR submitted extensive questions and comments to GTE RE.Id. ¶ 12. GTE RE agreed to make revisions to the plan to address the substantial changes DBR believed to be in the creditors' best interests. Id. Thereafter, DBR concluded that, contingent upon the requested revisions, the Commutation Plan was fair and did not materially adversely affect any creditor.Id. ¶¶ 9, 13. DBR gave its final approval to the Commutation Plan on June 25, 2010. Id. ¶ 13.
On June 28, 2010, in accordance with the Restructuring Act and Reg. 68, GTE RE initiated the instant action by filing a petition for implementation of the Commutation Plan with this Court. On July 21, 2010, following a properly noticed hearing, this Court determined that a single class of creditors was appropriate and granted GTE RE's motion for leave to convene a Meeting of Creditors and for a scheduling order. The Court's Order provided: *Page 11 
 "Assuming a favorable vote at the Meeting of Creditors, the Court shall conduct a hearing at 11:00 a.m. EST on December 15, 2010 to determine whether implementing the Commutation Plan would not materially adversely affect either the interests of the objecting creditors or the interests of assumption policyholders, and to enter an order implementing the Commutation Plan." See In re GTE Reinsurance Co. Ltd., No. 10-3777 (R.I. Super. Ct. July 21, 2010) (Order).
After GTE RE provided the requisite notice to its creditors, a Meeting of Creditors was held on November 30, 2010. The votes cast at the meeting exceeded the statutory criteria for implementation of the Commutation Plan. GTE RE's Motion for Confirmation of the Vote at the Meeting of Creditors and for an Order Implementing the Commutation Plan ¶ 11. Indeed, at the meeting, thirty-four of thirty-nine cedents, or 87.18% of the single class of creditors, voted in favor of the Commutation Plan.Id. This represented 97.37% of the value of liabilities owed to the voting members of the creditor class that submitted proxy forms and 79% of GTE RE's total composite reserve as of the date of the meeting. Id.
Five cedents, representing 2.13% of GTE RE's total composite reserve as of the date of the Meeting of Creditors, voted against the Commutation Plan. Id. At the meeting, the Odyssey Insureds, through a representative, objected to the valuation ascribed to their claims. The Odyssey Insureds estimated the value of their claims to be in excess of $1,300,000, or almost $300,000 more than what was reported to the National Association of Insurance Commissioners on its December 31, 2009 regulatory filings.Id. ¶ 14(e). However, because the Odyssey Insureds failed to account for the discrepancy, the Chairman disregarded the higher claim value, and valued their current and future claims at $1,069,668. Id.
On December 2, 2010, GTE RE filed its motion to confirm the vote and implement the Commutation Plan at the December 15, 2010 hearing. On December 14, 2010, the Odyssey *Page 12 
Insureds filed their objections to the vote and Commutation Plan and challenged the constitutionality of the Restructuring Act. Following several continuances, a hearing was held on March 16, 2011.
 III Standard of Review
In assessing the Odyssey Insureds' challenge to the constitutionality of the Restructuring Act, the Court must begin with the principle that legislative enactments of the General Assembly are presumed to be valid and constitutional. SeeNewport Court Club Assocs. v. Town Council of Middletown,800 A.2d 405, 409 (R.I. 2002) (citing Rhode Island DepositorsEcon. Prot. Corp. v. Brown, 659 A.2d 95, 100 (R.I. 1995),cert. denied, 516 U.S. 975, 116 S. Ct. 476 (1995)). The Court is to approach constitutional questions with great deliberation, caution, and reluctance, and should never declare a statute void unless it finds it to be invalid beyond a reasonable doubt.See Moreau v. Flanders, No. 10-5672, 2011 WL 1136079, at *5 (R.I. Mar. 29, 2011) (citingGorham v. Robinson, 57 R.I. 1, 7, 186 A. 832, 837 (1936)). To be deemed unconstitutional, a statute must palpably and unmistakably be characterized as an excess of legislative power. SeeCity of Pawtucket v. Sundlun, 662 A.2d 40, 44-45 (R.I. 1995);see also Gem Plumbing Heating Co. v. Rossi,867 A.2d 796, 808 (R.I. 2005) (quoting Lynch v. King,120 R.I. 868, 875, 391 A.2d 117, 121 (1978)) (explaining that when reviewing the constitutionality of a legislative enactment, a court must attach every reasonable intendment in favor of constitutionality to the enactment).
Further, it is axiomatic that "`the party challenging the constitutional validity of [a statute] carries the burden of persuading the court that [it] violates an identifiable aspect of the Rhode Island or United States Constitution." Moreau,2011 WL 1136079, at *5 (quoting *Page 13 Newport Court, 800 A.2d at 409. Unless the party challenging the statute can establish beyond a reasonable doubt that a specific provision of the United States or Rhode Island Constitution has been violated, the Court will not hold the statute unconstitutional.Id. (quoting Mackie v. State,936 A.2d 588, 595 (R.I. 2007); see also Sundlun,662 A.2d at 44-45 (stating that because of the broad plenary power of the General Assembly, a court is extremely deferential when evaluating legislative enactments).
 IV Discussion A Contract Clause Article I, § 10, Clause 1 of the United States Constitution
provides that "no state shall . . . pass any bill of attainder, ex post facto law or law impairing the obligation of contracts." Similarly, Article I, § 12 of the Rhode Island Constitution states that "no ex post facto law or law impairing the obligation of contracts shall be passed."[15] Although the literal terms of both provisions strictly limit the power of a state to regulate private contracts, the United States Supreme Court has refused to apply the Draconian language with such stringent exactitude. SeeBrennan v. Kirby, 529 A.2d 633, 637 (R.I. 1987); seealso Allied Structural Steel v. Spannaus,438 U.S. 234, 240, 98 S. Ct. 2716, 2720 (1978) (explaining that courts should depart from the literal language of the Contract Clause because literalism would deprive a state of its prerogative of self-protection and be destructive of the public interest). Rather, a "legislative enactment will *Page 14 
pass constitutional muster under contract clause analysis so long as it is reasonable and necessary to carry out a legitimate public purpose." Brennan, 529 A.2d at 638 (citingUnited States Trust Co. v. New Jersey,431 U.S. 1, 25-26, 97 S. Ct. 1505, 1519 (1977)).
Over time, Rhode Island courts have espoused the test devised by the United States Supreme Court when scrutinizing alleged Contract Clause violations. See, e.g., Nonnenmacher v. City ofWarwick, 722 A.2d 1199, 1202 (R.I. 1999); see also In reAdvisory Opinion to Governor (DEPCO),593 A.2d 943, 948-49 (R.I. 1991). Under this three-part test, a court must first determine whether "the state law [has] in fact substantially impaired a contractual relationship." SeeEnergy Reserves Grp., Inc. v. Kansas Power Light Co.,459 U.S. 400, 411-12, 103 S. Ct. 697, 704-05 (1983). If so, a court must then examine whether the state can "show a legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem." Id. Lastly, a court must decide whether the "legitimate purpose [is] sufficient to justify the impairment of the contractual rights." Id.
 1 Substantial Impairment
Similarly, our Supreme Court has adopted the United States Supreme Court's three-part test to determine whether a contractual relationship has been substantially impaired. SeeRetired Adjunct Professors of R.I. v. Almond,690 A.2d 1342, 1345 n. 2 (citing Brown, 659 A.2d at 106);see also General Motors Corp. v. Romein,503 U.S. 181, 186, 112 S. Ct. 1105, 1109 (1992) (detailing the United States Supreme Court's substantial impairment analysis). Indeed, our Supreme Court has explained:
 "Generally we look to see whether the change in law operates as a substantial impairment of a contractual relationship. This inquiry has three elements: whether there is a contract, whether the law in *Page 15 
question impairs an obligation or right under that contract, and whether the impairment is substantial. But even if the new law constitutes a substantial impairment, it still will not be deemed unconstitutional as a violation of the applicable contract clauses, if it is reasonable and necessary to carry out a legitimate public purpose." Retired Adjunct Professors, 690 A.2d at 1345 n. 2 (internal citations and quotations omitted); see also Brennan, 529 A.2d at 638.
In the instant matter, neither party disputes, nor does the Court question, the existence of a contractual relationship between GTE RE and the Odyssey Insureds. For that reason, the Court will proceed with its analysis of whether the Restructuring Act impairs the Odyssey Treaties and whether that impairment is substantial.
In assessing the validity of the instant Contract Clause claim, the Court must identify the precise contractual rights that have been impaired. See Equipment Mfrs. Inst., AGCO v.Janklow, 300 F.3d 842, 851 (8th Cir. 2002) (quoting KeystoneBituminous Coal Ass'n v. DeBenedictis,480 U.S. 470, 504, 107 S. Ct. 1232, 1251-53 (1987)). The Odyssey Insureds contend, and this Court agrees, that several contractual rights and obligations within the Odyssey Treaties may have been altered or impaired, including: (1) indemnification by GTE RE for the actual value of all present and future claims; (2) the arbitration and choice of law provisions; and (3) the bilateral nature of the treaties. See Mar. 16, 2011 Hearing Tr. 9-13.
However, impairment alone is not sufficient to violate the Contract Clause. See United States Trust,431 U.S. at 20, 97 S. Ct. at 1517 (affirming that a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question of whether that impairment is permitted under the Constitution). The Court must next examine the extent to which the rights and responsibilities of the contracting parties have been adjusted and *Page 16 
determine whether the impairment is substantial. SeeAllied Structural Steel,438 U.S. at 244, 98 S. Ct. at 2722 (quotingUnited States Trust, 431 U.S. at 22, 97 S. Ct. at 1518).
It is axiomatic that complete destruction of the rights of a contracting party is not required to find an impermissible impairment. See United States Trust,431 U.S. at 27, 97 S. Ct. at 1520. Rather, the severity of the impairment merely determines the "height of the hurdle the state legislation must clear." Allied Structural Steel,438 U.S. at 245, 98 S. Ct. at 2723 (explaining that minimal alteration of contractual obligations may end the inquiry at its first stage; while severe impairment will push the inquiry into a careful examination of the nature and purpose of the state legislation). As part of its inquiry, the Court must consider the nature of the impairment on the Odyssey Treaties, and how previous regulations affect the extent of the impairment. SeeJanklow, 300 F.3d at 854. Significant among the factors that should bear on the Court's determination are: (1) whether the state has restricted a party to gains they reasonably expected from the contract;[16] and (2) the extent to which the industry entered into by the contracting parties was supervised by the state at the time of the agreement. See Energy Reserves,459 U.S. at 411, 103 S. Ct. at 704; see also In re Workers'Compensation Refund, 46 F.3d 813, 819 (8th Cir. 1995) (explaining that when determining the nature of the impairment a court must also consider the extent to which the parties' reasonable contract expectations have been disrupted). *Page 17 
 a Nature of the Impairment i Indemnification Rights
At the core, the Odyssey Insureds' challenges and objections focus on the Commutation Plan's negation of GTE RE's future indemnification obligations and the risk that an upfront payout, based on an actuarial estimate of present and future claims, would be less than if GTE RE remained in run-off. Specifically, the Odyssey Insureds assert that the Restructuring Act and Commutation Plan substantially impair their contract rights because the central purpose of the Odyssey Treaties — shifting risk from one party to the other — is completely abrogated in exchange for a potentially insufficient sum of money. The Court, however, does not agree.
While the Court acknowledges that the "essence" of insurance is the transfer of risk, the Court is of the opinion that at its most basic level, the risk involved is essentially about the right to receive, and the obligation to make, a monetary payment when a claim arises. See 1 Steven Plitt, et al., Couch onInsurance 3d § 1:6, at 1-16 (2009) (stating that "insurance is a contract by which one party (the insurer), for a consideration that usually is paid in money, either in a lump sum or at different times during the continuance of the risk, promises to make a certain payment, usually of money, upon the destruction or injury of `something' in which the other party (the insured) has an interest"); see also Kenneth J. Arrow, Insurance, Risk andResource Allocation (1965), reprinted in 4 Collected Papers ofKenneth J. Arrow: The Economics of Information, 77, 78 (1984). Indeed, the risk assumed by GTE RE under the Odyssey Treaties is the responsibility to reimburse the Odyssey Insureds for, or indemnify them against, covered claims and legal fees *Page 18 
incurred in defending those claims, up to the treaties' monetary cap.[17] See Couch on Insurance
3d § 1:6, at 1-17 (stating that another common definition of insurance is "a contract to pay a sum of money upon the happening of a particular event or contingency"). Put simply, the Odyssey Insureds contracted for the payment of money, and under the Commutation Plan, that is exactly the benefit they will receive.See Mar. 16, 2011 Hearing Tr. 84; see also FaitouteIron Steel Co. v. City of Asbury Park,316 U.S. 502, 511, 62 S. Ct. 1129, 1134 (1942) (clarifying that under Contract Clause analysis, it is significant that a state statute is designed to permit performance of contractual obligations, even if it entails some modification, because "[i]mpairment of an obligation means refusal to pay an honest debt; it does not mean contriving ways and means for paying it");City of El Paso v. Simmons,379 U.S. 497, 509, 85 S. Ct. 577, 584-85 (1965) (finding it critical in upholding a statute that even though the law clearly eliminated some contract rights on paper, it had been designed to preserve the substantial and practical rights that gave value to the purchasers' contracts). For that reason, the Court does not believe that an actuarial-based estimated payout of the Odyssey Insureds' present and future claims substantially impairs their contractual rights or their reasonable contractual expectations.
This is particularly true where, as here, the Odyssey Insureds have failed to establish beyond a reasonable doubt that the actuarial-based payout will, as a matter of fact, be less than *Page 19 
their recovery if GTE RE remained in run-off. Frankly, the evidence before the Court is simply insufficient to establish with any certainty that the Odyssey Insureds indemnification rights would be substantially impaired by the Commutation Plan. Although the Commutation Plan states that "there is a risk that [creditors] may ultimately receive less . . . than they would have received had [GTE RE's] business been run off in the traditional way," it also provides that "given the Composite Reserve methodology . . . used in . . . estimating [creditor's claims], [creditors] potentially may receive more . . . than they would otherwise have received had [GTE RE's] business been run off in the traditional way."See Commutation Plan at 13.
Similarly, in his rebuttal actuarial report, GTE RE's expert, Michael Toothman (Toothman), stated:
 "[Although] [u]nder the Commutation Plan . . . the losses covered under the reinsurance contract will now be the responsibility of [the Odyssey Insureds,] [t]hese losses may ultimately be either more than the Commutation Payment or less than the Commutation Payment. . . . [I]t is not clear whether [the Odyssey Insureds'] financial positions will ultimately turn out to be more favorable or less favorable." Toothman Rebuttal Actuarial Report 4-5.
Toothman further explained that the composite reserve figure, used as a starting point for determining the payout to each creditor, "include[d] at least two assumptions that appear[ed] to be very conservative, thereby reducing the possibility that [the Odyssey Insureds] would be adversely affected by the Plan."Id. at 7; see also Mar. 16, 2011 Hearing Tr. 83. In particular, by using U.S. Treasury Strip rates — rates below the 3.5% used by the Odyssey Insureds to discount a portion of their own reserves on their financial statements — to discount the present value of future payouts, GTE RE has ensured that the composite reserve methodology will result in high *Page 20 
payouts. Id. Likewise, the survival ratio[18] factor used in the composite reserve methodology is not only conservative, but significantly greater than the ratio used by the Odyssey Insureds.Id. Under the Commutation Plan,
 "the survival ratio of 25.7 years used to calculate the Composite Reserve is much greater than the survival ratio for asbestos and environmental-related liabilities used by [the Odyssey Insureds]. The survival ratio used by [the Odyssey Insureds] is seven years for asbestos and environmental liabilities combined, eight years for the asbestos-related liabilities and three years for the environmental-related liabilities. [However], a reserve based on survival ratio in excess of 25 will provide a much higher Commutation Payment than would be the case if a survival ratio of seven has been used." Id.
Moreover, this Court is bound by the well-established precedent of our Supreme Court. On several occasions, our Supreme Court has declined to find a substantial impairment of contractual rights where the party raising a Contract Clause challenge failed to provide evidence of definite or actual impairment. See,e.g., Retired Adjunct Professors, 690 A.2d at 1347;Nonnenmacher, 722 A.2d at 1203; DEPCO, 593 A.2d at 949. Indeed, in Retired Adjunct Professors, our Supreme Court upheld a 1995 legislative enactment which capped the gross part-time salary retired former state employees could earn and still remain eligible for their pensions. See 690 A.2d at 1348. There, the Court held that it was not clear "as a factual matter" that the statutory enactment would "actually have" an adverse impact, and therefore, declined to find substantial impairment. Seeid. at 1347.
Similarly, in Nonnenmacher, the Warwick City Council passed an ordinance setting the pension benefits of all permanent firefighters placed on the pension list as a result of a service-related *Page 21 
injury to 66 2/3% of their highest salary, and limiting recovery in those instances where a firefighter earned additional income from other employment. See 722 A.2d at 1201. After the pension board sought a refund of benefits from plaintiffs because of other earned income, plaintiffs filed suit claiming, inter alia, a Contract Clause violation. Id. Upon review, our Supreme Court held that the ordinance did not impose a substantial impairment, particularly because the plaintiffs had failed to establish that the ordinance would "necessarily" impair or reduce the pension benefits they ordinarily would have received. Id. at 1203.
The Court also finds DEPCO particularly instructive. InDEPCO, our Supreme Court held that a statute altering the priority of creditor's claims — even though it exposed some creditors to the risk that they would never recover — did not violate the Contract Clause. See 593 A.2d at 949. There, the creditor-plaintiffs challenged the DEPCO Act, which altered the traditional receivership law by providing for depositors to be paid in full before general creditors. The creditor-plaintiffs alleged that by altering the priority of their claims, their recovery could be substantially affected if the available assets were inadequate.Id. The Court, nevertheless, determined that because of the indefiniteness of the impairment, and the fact that the insolvent institution was still bound to pay, the statute did not impair the contractual relationship but merely affected the timing of payment.Id.
Accordingly, here, the Court finds that the mere fact that the acceleration of GTE RE's payments under the Commutation Plan may expose the Odyssey Insureds to some risk that those payments will amount to less than their actual claims, does not constitute substantial impairment of the obligations under the Odyssey Treaties and is insufficient to violate the Contract Clause. Although the Odyssey Insureds contend that under Southern Cal. Gas Co. v. Cityof Santa Ana, they need not make an actual showing that the Commutation Plan will cause substantial *Page 22 
impairment, the Court finds the Odyssey Insureds' reliance thereon to be unwarranted. See 336 F.3d 885 (9th Cir. 2003). Indeed, the Court recognizes that in Southern Cal. Gas, the Ninth Circuit held that it was unnecessary to resolve the question of substantial impairment through "valuation in terms of dollars."See id. at 890-92. However, there, unlike here, such a showing was unnecessary because the statutory enactment clearly, undeniably, and indefinitely imposed a substantial detriment by "increase[ing] the Gas Company's financial obligations beyond those specified" in the contract and imposing an "additional cost [that was] direct, immediate and measurable." Seeid.; see also United States Trust,431 U.S. at 19, 97 S. Ct. at 1516 (holding that the question of actual valuation of impairment need not be resolved where the statutory enactment eliminated an important security provision which clearly and undeniably affected the overall value and security of the bonds).
Therefore, where, as here, it is neither clear nor certain that the Commutation Plan will impair the Odyssey Insureds' rights, the Court finds that an actuarial-based estimated payout of the Odyssey Insureds' present and future claims is not a substantial impairment. Under the circumstances, simply stating that the Commutation Plan may provide for a different payout than originally contracted for is simply insufficient to rise to the level of substantial impairment.
 ii Other Contractual Rights
The Odyssey Insureds also contend that the Restructuring Act and Commutation Plan impair other contractual rights. Specifically, they argue that the Restructuring Act and Commutation Plan negate the arbitration and choice of law provisions contained in the Odyssey Treaties, and change the treaties from bilateral agreements between GTE RE and the Odyssey Insureds into multilateral agreements. *Page 23 
In connection with the arbitration and choice of law provisions, the Restructuring Act, Reg. 68, and the Commutation Plan: (1) prevent any legal or arbitration proceedings from being commenced or continued in order to obtain payment or establish the existence or amount of a claim; (2) provide that the Commutation Plan's dispute resolution procedures trump any dispute resolution procedures in the Odyssey Treaties; (3) require that the Commutation Plan be governed by, and construed in accordance with, the laws of Rhode Island; and (4) grant this Court with the exclusive jurisdiction to hear and determine any suit, action, or proceeding, and to settle any dispute which may arise in connection with the Commutation Plan. Despite these alterations, the Court finds the Supreme Court's analysis in City of El Paso to be instructive. In City of El Paso, the Supreme Court held that a statute eliminating an unlimited right to cure defaults in certain contracts did not substantially impair rights because the particular clause at issue was "not the central undertaking" of the contracts, and the Court did not believe that "the buyer was substantially induced to enter into these contracts on the basis" of that particular clause. See 379 U.S. at 514, 85 S. Ct. 586-87. Here, the Odyssey Insureds attempt to establish substantial impairment by arguing that the choice of law and arbitration provisions are material terms of the Odyssey Treaties. SeeUSA Cable v. World Wrestling Fed'n Entm't, Inc.,766 A.2d 462, 470 (Del. 2000). However, simply because those provisions may be deemed "material" to a contract, it does not follow that they were a "central undertaking" or a "substantial inducement." Accordingly, despite the Odyssey Insureds best efforts, the Court finds that they have failed to establish that these provisions were a central undertaking or substantial inducement to the parties to the Odyssey Treaties, and therefore, their alteration by the Commutation Plan is insufficient to rise to the level of substantial impairment. *Page 24 
Even if the Court were to assume that these provisions were a central undertaking or substantial inducement, upon a review of the Commutation Plan, the Court remains convinced that any impairment that may result from their alteration would not be substantial. The Odyssey Insureds object to the substitution of the Odyssey Treaties' tri-partite arbitration provision with the Commutation Plan's single arbitrator provision. However, a review of the Commutation Plan's adjudicatory procedures reveals, that while the alteration may be an impairment, it certainly is not substantial. Rather, the adjudicatory procedures delineated in the Commutation Plan directly address the Odyssey Insureds' concerns over an adjudicator handpicked by GTE RE. Indeed, the Commutation Plan provides the Odyssey Insureds with a mechanism by which to challenge an adjudicator who may have a conflict of interest in relation to a disputed claim, and then seek the appointment of an alternate by agreement or by appointment of this Court. See Commutation Plan § 3.6.8.
Furthermore, despite the alteration, the Commutation Plan allays the risk of any bias or impairment by affording the Odyssey Insureds with the right to appeal the adjudicator's decision to this Court.Id. § 3.6.11. On appeal, the Court is directed to
 "determine the standard of review applicable to any legitimate appeal from any of the Commutation Plan Adjudicator's decisions consistent with standards of review following the determination of a dispute by an arbitrator or panel of arbitrators as provided by the Rhode Island Administrative Procedures Act, [G.L. 1956] § 42-35-15(g), the Federal Arbitration Act or similar statute." Id.
Therefore, under the Commutation Plan, this Court is expressly empowered to review the adjudication procedure for "evident partiality" and to serve as the final arbiter of any dispute.See 9 U.S.C. § 10(a)(2) (stating that an award may be vacated if "there was evident partiality or corruption in the arbitrators"). *Page 25 
Likewise, although the Commutation Plan alters the Odyssey Insureds' choice of law by designating Rhode Island law as the governing law, the Court is of the opinion that, under the circumstances, such an impairment is insufficient to amount to a substantial impairment. Here, although the Commutation Plan provides that Rhode Island law shall govern any dispute in connection with the Commutation Plan, nothing in the plan
 "shall affect the validity of any other provisions determining governing law and jurisdiction as between the GTE RE and any of its [creditors] whether contained in any contract or otherwise and not relating to any dispute arising out of the Explanatory Statement or any provisions of the Commutation Plan or any action or omission thereunder or in connection with the administration of the Commutation Plan." See Commutation Plan § 10.4.
Accordingly, even if the Court were to assume that the choice of law provision was a substantial inducement for the contracting parties, the alteration of the choice of law provision is only directed at disputes arising out of the Commutation Plan, and New York law still governs the interpretation and application of the Odyssey Treaties. Therefore, the Court finds that the parties' choice of law has not been negated, and the alteration is not a substantial impairment.
The Odyssey Insureds also argue that the Restructuring Act and Commutation Plan impair their contractual rights by fundamentally changing the Odyssey Treaties from bilateral agreements to multilateral agreements. The Court, however, is not persuaded that by allowing a class of creditors to vote on whether or not to approve the Commutation Plan, the Restructuring Act and Commutation Plan convert the Odyssey Treaties from bilateral to multilateral contracts. Despite the creditor vote, the Odyssey Treaties remain contracts between the Odyssey Insureds and GTE RE. Furthermore, regardless of the manner in which the Commutation Plan is approved, the procedure for determining, collecting, and disputing claims is neither subject to, nor contingent upon, the other creditors, but rather, it remains between the Odyssey Insureds and *Page 26 
GTE RE. Consequently, the Court finds that the creditor vote does not change the nature of, or substantially impair, the rights of the parties under the Odyssey Treaties.
 b The Impairment was Foreseeable
It is long settled that "one whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." Energy Reserves,459 U.S. at 411, 103 S. Ct. at 704. It follows, therefore, that the second step in analyzing the extent of the impairment on the Odyssey Treaties is a determination of whether previous regulation made the impairment foreseeable and affected the parties' reasonable expectations. See Janklow, 300 F.3d at 857. A key factor in determining the parties' expectations is "`whether the industry, into which the complaining party has entered, has been regulated in the past.'" Id. at 854 (quoting Energy Reserves,459 U.S. at 411, 103 S. Ct. at 704 (explaining that if contractual rights are already subjected to regulation, or the parties are operating in a heavily regulated industry, then further regulation is foreseeable)). Indeed, a party's expectation of future regulation is important in determining whether contractual rights are substantially impaired because parties bargain for contractual terms based on those expectations; if those expectations are fulfilled, the Court will not relieve parties of their obligations.See, e.g., Energy Reserves,459 U.S. at 411, 103 S. Ct. at 704; Home Bldg. LoanAssn. v. Blaisdell,290 U.S. 398, 435, 54 S. Ct. 231, 239 (1934) (affirming that a party's expectations are necessarily limited by "existing laws," which are "read into contracts in order to fix obligations as between the parties").
Here, Bermuda law provides a point of reference to determine the parties' expectations because, at the time the Odyssey Treaties were negotiated and finalized, GTE RE was domiciled *Page 27 
in Bermuda and had all the powers granted to a Bermuda corporation under the Bermuda Companies Act. See Blaisdell,290 U.S. at 429-430, 54 S. Ct. at 237 (noting that it is "the laws which subsist at the time and place of the making of a contract, and where it is to be performed," that "enter into and form a part of it," for purposes of assessing expectations);see also Romein,503 U.S. at 189, 112 S. Ct. at 1111 (explaining that Contract Clause analysis requires an assessment of the "laws in existence when [the contract] was made"). Accordingly, looking to Bermuda law, § 2 of the Bermuda Companies (Arrangements and Reconstructions) Act 1975 (1975 Act)[19] provides:
 "(1) Where a compromise or arrangement is proposed between a company and its creditors or any class of them or between a company and its members or any class of them, the Court may, on the application in a summary way of the company or of any creditor or member of the company, or, in the case of a company being wound up, of the liquidator, order a meeting of the creditors or class of creditors, or of the members of the company or class of members, as the case may be, to be summoned in such a manner as the Court directs."
Hence, by the very terms of the Companies Act, it is clear that as early as July 14, 1975, Bermuda had legislation in place providing for schemes of arrangement between Bermuda domiciled companies and their creditors. See Bell Aff. ¶¶ 5, 12, 14.
The Odyssey Insureds contend that because Bermuda's Companies Act was not used by a solvent insurance company to run-off its business until the mid-1990s, [20] such a development could not have been part of the parties' reasonable expectations in 1980-81. The Court, *Page 28 
however, is simply not persuaded. Even though the first solvent scheme of arrangement did not occur until the 1990s, relevant portions of Bermuda's Companies Act are drawn from, and identical to, prior English law, which has been applied to solvent companies since at least 1917.[21] Id. ¶¶ 3, 6-9; see alsoIn re Guardian Assurance Company, 1917 1 Ch 431, 448;Scottish Lion Ins. Co. Ltd. v. Goodrich Corp., [2010] S.C. 349, 364 ¶ 43 (affirming that "[t]here is nothing in [England's Companies Act of 1907] nor in its descendants (down to and including Pt 26 of the Companies Act 2006) to suggest that applications for sanction of a `solvent scheme' are in principle to be dealt with differently from those where the company is insolvent or on the verge of insolvency"). Further, the Court finds that the 1975 Act, by its very terms, applies to both solvent and insolvent companies.See Bell Aff. ¶ 8. The 1975 Act applies both "[w]here a compromise or arrangement is proposed between a company and its creditors . . ." and "in the case of a company being wound up."See 1975 Act § 2. Therefore, in view of this legislative and legal landscape, the Court finds that any party entering into a contract with a Bermuda company after 1975 should be deemed to have reasonably expected that the company could enter into a solvent scheme of arrangement with its creditors. SeeCanada S. Ry. Co v. Gebhard,109 U.S. 527, 537-38 (1883) (affirming that those doing business with foreign corporations are exposed to the risk of having their contracts altered under the law of the foreign corporation's *Page 29 
domicile and are "conclusively" presumed to have contracted with a view of the foreign laws governing the foreign corporation).
The Odyssey Insureds also assert that the Court should not look to the status of Bermuda law, but rather to Rhode Island, as the state that passed the statute at issue. However, even assuming,arguendo, that the Odyssey Insureds are correct, given the status of the law and highly regulated nature of commercial insurance in Rhode Island, the Court finds that the impairment was similarly foreseeable. Indeed, it is generally well-settled that the insurance industry has "historically been the subject of economic regulation." Boneta v. Fernandez,950 F. Supp. 432, 435 (D.P.R. 1996) (explaining that in order to protect the general welfare, each state has enacted its own comprehensive regulatory scheme for the insurance industry, "including the liquidation of insurers"); see also Couch onInsurance 3d § 2:1, at 2-3 (stating that "[i]nsurance is a highly regulated industry due to its well-recognized importance to the public interest, rendering it a proper subject of regulation and control by the states through the exercise of their police powers"). Specifically, the DBR and Attorney General Kilmartin maintain that the State has been regulating commercial insurance since 1898, and they direct the Court to the seventy-four chapters comprising the insurance title of the General Laws as evidence of its highly-regulated nature.[22] Accordingly, the Court agrees with both the DBR and Attorney General Kilmartin that the State's extensive and constantly evolving regulation of insurance and reinsurance companies should have put creditors on notice that their contracts could be subject to modification or *Page 30 
extinguishment, and it follows therefore, that the Odyssey Insureds' "individual expectations of immunity from future statutory change" are similarly unwarranted under Rhode Island. See RetiredAdjunct Professors, 690 A.2d at 1347.
Moreover, the fact that Rhode Island's pre-existing regulations do not directly address the particular subject matter of the Restructuring Act is of no moment to the Court. It is well settled that to be within a party's reasonable expectations, the new regulation need not be precisely the same as previous regulations. See Energy Reserves,459 U.S. at 413-14, 103 S. Ct. at 706. Rather, the Supreme Court has found it sufficient that the state's supervision of the industry "was extensive and intrusive."[23] Id.; see alsoLiberty Mut. Ins. Co. v. Whitehouse,868 F. Supp. 425, 432 (D.R.I. 1994) (rejecting challenger's objection to a legislative amendment — that lack of precedent made changes unforeseeable — where state regulation of the field was pervasive and periodic).
Consequently, in light of Bermuda's legal and legislative framework, the Court finds that the actions taken by the State under the Restructuring Act were reasonably foreseeable. Moreover, given the highly regulated nature of the commercial insurance industry, the Court finds that the contractual alterations and modifications authorized by the Restructuring Act and Commutation Plan should have been within the reasonable expectations of the parties. For all of the reasons set forth herein, the Court finds that the Restructuring Act and Commutation Plan do not substantially impair the Odyssey Insureds' contractual rights. *Page 31 
 2 Legitimate Public Purpose
Assuming, arguendo, that the Court was to find that the Restructuring Act and Commutation Plan substantially impair the parties' contract rights, that alone may be insufficient to amount to a Contract Clause violation. See Retired AdjunctProfessors, 690 A.2d at 1345 n. 2 (affirming that a finding of substantial impairment does not necessarily amount to Contract Clause violation). Rather, a statute will be deemed constitutional, despite any substantial impairment, where a state establishes that the regulation is justified by a significant and legitimate public purpose. See Energy Reserves,459 U.S. at 411-12, 103 S. Ct. at 704; see also AlliedStructural Steel, 438 U.S. at 249, 98 S. Ct. at 2724 (affirming that a state must show that the regulation protects a "broad societal [or economic] interest rather than a narrow class").
As the Supreme Court declared in Allied Structural Steel,
 "`[i]t is settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.'" See 438 U.S. at 241, 98 S. Ct. at 2721 (quoting Manigault v. Springs, 199 U.S. 473, 480, 26 S. Ct. 127, 130 (1905)).
However, the Supreme Court has cautioned that the state's police power is not unlimited. See Allied Structural Steel,438 U.S. at 242, 98 S. Ct. at 2721 (warning that "[i]f the Contract Clause is to retain any meaning at all . . . it must be understood to impose some limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise *Page 32 
legitimate police power"). Indeed, "[t]he requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." Energy Reserves,459 U.S. at 412, 103 S. Ct. at 705.
It is against this background that the Court recognizes the importance of allowing states the freedom to legislate on social and economic matters of importance to their citizens and to modify the law to meet changing needs and conditions. SeeLefrancois v. State of R.I.,669 F. Supp. 1204, 1215 (D.R.I. 1987); see alsoManigault, 199 U.S. at 480-81, 26 S. Ct. at 130 (recognizing that "[w]hile [the State's police power] is subject to limitations in certain cases, there is wide discretion on the part of the legislature in determining what is and what is not necessary, a discretion which courts ordinarily will not interfere with"). Particularly, where, as here, the State is alleged to have impaired private contracts, the Court must grant more latitude to the State, "since states have broad discretion to determine whether an impairment of a private contract is reasonable or necessary."See Parella v. Retirement Bd. of R.I. Emps.'Ret. Sys., 173 F.3d 46, 59 (1st Cir. 1999) (citingUnited States Trust, 431 at 25-26, 97 S. Ct. at 1519-20) (explaining that the height of the hurdle a plaintiff must overcome when challenging a statute, depends on whether the impaired contract is public or private). Consequently, the Court need not examine "[w]hether the legislation is wise or unwise as a matter of policy," but rather simply determine whether the alteration of the parties' contracts was justified by a significant and legitimate public purpose. See Blaisdell,290 U.S. at 447, 54 S. Ct. at 243.
In this case, it is clear from Governor Almond's Executive Order that the underlying goal of the Task Force was to stimulate Rhode Island's economy by attracting segments of the insurance industry to the State. According to Attorney General Kilmartin, the purpose of the Restructuring Act is to "provide a mechanism to bring the solvent runoff process within the *Page 33 
already highly regulated insurance industry, resulting in timely payments to creditors, allowing businesses to change their business model when they deem necessary, and to do so in an expeditious and fair way." See Attorney General Mem. 2-3.
Likewise, the DBR asserts that the Restructuring Act: (1) provides certainty of payment to creditors; (2) avoids a lengthy run-off and limits ongoing administrative costs, adverse claim development, and deteriorating reinsurance collections; (3) promotes fairness in result and prevents unfair preferences amongst creditors; (4) reduces the risk of loss of information interfering with claim processing; (5) allows for more efficient deployment of capital to non-runoff operations; and (6) enhances regulatory oversight over the run-off process.[24] See DBR Mem. 10-12. In turn, the DBR contends that the Restructuring Act not only protects creditors domiciled in Rhode Island from the harms of insurance companies in run-off, but also achieves Governor Almond's original objective of making Rhode Island an attractive location for insurance companies — whether or not they are in run-off — and encouraging economic growth and increased investment in industry and jobs. Id.
Moreover, despite the Odyssey Insureds' best efforts, the Court is not persuaded that the Restructuring Act was intended to advance only one party's private interests. See Blue Cross/BlueShield, 2005 WL 1530449, at *8 (stating that the function of the public-purpose analysis is to ensure that the State is not merely advancing one contractual party's private interests). Rather, it is clear to the Court that the Restructuring Act is generally directed at *Page 34 
Rhode Island's commercial insurance industry as a whole, and that one of the State's legitimate motivations and objectives was to stimulate and support Rhode Island's economy.
Indeed, it is undeniable that economic concerns represent a valid public interest in Rhode Island. See, e.g.,Nonnenmacher, 722 A.2d at 1203 (upholding a statute reducing pension benefits and requiring retired firemen to return overpayments because, despite being a substantial impairment, it was in the public interest); DEPCO, 593 A.2d at 949 (holding that a statute benefitting creditors and the economy addresses a legitimate public purpose and justifies the substantial impairment of contracts). Specifically, a state's goal of attracting new business has been deemed a legitimate public purpose.See Metropolitan Life Ins. Co. v. Ward,470 U.S. 869, 879, 105 S. Ct. 1676, 1682 (1985); see alsoZobel v. Williams,457 U.S. 55, 67-68, 102 S. Ct. 2309, 2317 (1982) (stating that "a state clearly may undertake to enhance the advantage of industry, economy, and resources that make it a desirable place in which to live. . . . Through these means, one State may attract citizens of other States to join the numbers of its citizenry.").
In light of the foregoing, the Court is satisfied that the Restructuring Act is a legitimate legislative enactment which addresses the State's economic concerns and protects commercial insurance creditors against the harms of run-off. Therefore, the Court is bound to pay due deference to its co-equal branch of government, the General Assembly, and is satisfied that even if the Restructuring Act substantially impaired contractual rights, any impairment is justified by a legitimate public purpose.
 3 Reasonable Necessary
Assuming arguendo, that the Restructuring Act was found to substantially impair a contractual relationship, the Court must next determine "whether the adjustment of `the rights *Page 35 
and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's adoption].'"Energy Reserves, 459 U.S. at 412, 103 S. Ct. at 705 (quotingUnited States Trust, 431 U.S. at 22, 97 S. Ct. at 1518). In other words, even if the Restructuring Act was found to substantially impair a contractual relationship, this Court may nevertheless uphold it, upon concluding that the statute was reasonable and necessary in light of the legislature's legitimate public purpose. See United States Trust,431 U.S. at 25, 97 S. Ct. at 1519.
Generally, where the affected contract is a private one, "[a]s is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure."[25]Id. at 22-23, 97 S. Ct. at 1518; see alsoMercado-Boneta, 125 F.3d at 16 (stating that "[i]f the state has . . . altered none of its own financial obligations, then the legislative decisions deserve significant deference because the state is essentially acting not according to its economic interests, but pursuant to its police powers"). Therefore, the Court's role when reviewing whether a statute is necessary, is simply to ensure that the State has not "impose[d] a drastic impairment" despite evidence of a more moderate and equally as effective alternative.United States Trust, 431 U.S. at 31, 97 S. Ct. at 1522. Similarly, when reviewing a statute for reasonableness, this Court is directed to ensure that the statute is "reasonable in light of the surrounding circumstances." Id. *Page 36 
Upon a review of the record, the Court is satisfied that the State has done more than merely "mouth the vocabulary of the public weal in order to reach safe harbor." See McGrath v. Rhode IslandRet. Bd., 88 F.3d 12, 16 (1st Cir. 1996). This is not an instance in which the State has proffered "a vaguely worded or pretextual objective, or one that reasonably may be attained without substantially impairing the contract rights of private parties."Id. Rather, in 1995, Governor Almond specifically identified Rhode Island's insurance industry as a major target for greater development and a means by which the State could "creat[e] a wide range of good jobs and new investment with minimal environmental impact." See Exec. Order 95-21.
Indeed, in response to Governor Almond's directive, the General Assembly enacted a statutory scheme which not only makes Rhode Island an attractive domicile for insurance companies, but also promotes the "[a]ccelerated release of capital to shareholders . . . allowing for more efficient deployment of capital to non-run-off operations" and "attract[s] capital to the industry . . . creat[ing] an active market for investment in run-off companies." See
National Association of Insurance Commissioners, AlternativeMechanisms for Troubled Companies: An NAIC WhitePaper, at 13 (Feb. 2010). Although the Restructuring Act may admittedly attract insurance companies who will seek to quickly cease operations at the end of the commutation, the future availability of a "reasonable exit mechanism" will also entice and attract insurance companies not currently in run-off or immediately seeking commutation. Id. It follows therefore, that in both these instances, the Restructuring Act will encourage economic growth and result in increased investment in industry and jobs within the State. See DBR Mem. 10-12; see also DBR Reply 6. *Page 37 
Moreover, the Restructuring Act is not a drastic measure, as it provides sufficient safeguards to protect the parties' rights and interests.[26] As explained by the DBR and GTE RE's experts: (1) the DBR must review and approve any proposed commutation plan before it can be submitted to the Court; (2) the commutation process is governed by a dispute resolution provision which incorporates the review standards of the Federal Arbitration Act and protects against instances of partiality; (3) the Restructuring Act requires that majorities of voting creditors and supermajorities of voting creditors by value approve a proposed commutation plan; (4) the Restructuring Act requires this Court to determine whether a proposed commutation plan would "materially adversely affect" the interests of objecting creditors; (5) during the implementation period, the Restructuring Act requires quarterly reports regarding implementation and administration of the Commutation Plan to this Court and to the DBR; and (6) the assumptions used for calculating the composite reserve are more conservative than even those used by the Odyssey Insureds and will lead to high actuarial-based early payouts.
In light of the foregoing, the Court finds that "Rhode Island's [Restructuring Act] provides the best domestic resolution process yet devised for solvent `run-offs.'" See John J. Partridge,Rhode Island's Solvent Run-Off Statute 2. As previously articulated, the Restructuring Act is a means to address economic issues endemic to the insurance industry and Rhode Island as a whole. See Exxon Corp. v. Eagerton,462 U.S. 176, 191-92, 103 S. Ct. 2296, 2306 (1983) (explaining that legislation is generally upheld under the Contract Clause where the *Page 38 
statute does not prescribe a rule limited in effect to contractual obligations or remedies, but instead imposes a generally applicable rule of conduct designed to advance a broad societal interest). There is simply no evidence before this Court of either a less drastic, but equally as effective alternative, or that the Restructuring Act is unreasonable in light the State's economic condition and the issues plaguing the commercial insurance industry. Therefore, for the reasons set forth herein, the Court finds that the Restructuring Act is a reasonable and necessary means by which to address a legitimate public purpose.
 B Due Process
In addition to violating the Contract Clause, the Odyssey Insureds also allege that the Restructuring Act violates the Due Process Clause of the United States and Rhode Island Constitutions.[27]
Specifically, the Odyssey Insureds allege that the Restructuring Act amounts to an unconstitutional retroactive legislation for which there is no rational basis or legitimate government purpose.
Due process prohibits legislation that retroactively and unreasonably impairs substantive rights. See Landgraf v.USI Film Prods.,511 U.S. 244, 280, 114 S. Ct. 1483, 1505 (1994) (explaining that impairment may occur where a statute "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed"); see also Romein,503 U.S. at 191, 112 S. Ct. at 1112 *Page 39 
(emphasizing that retroactive legislation presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions). To comport with the requirements of due process, a statute may not retroactively abrogate a property interest unless that action is, at a minimum, justified by a legitimate legislative purpose furthered by rational means. See Pension Benefit Guar. Corp. v. R.A.Gray Co., 467 U.S. 717, 730, 104 S. Ct. 2709, 2718 (1984).
It is well settled, however, that "[e]conomic or social welfare legislation carries a presumption of validity and will be upheld against substantive due process challenges so long as the law bears rational relation to legitimate governmental objectives."Hargreaves v. Reis, 977 F. Supp. 123, 129 (D.R.I. 1997) (citing U.S. v. Carolene Prods. Co.,304 U.S. 144, 58 S. Ct. 778 (1938)); see alsoMetropolitan Prop. Cas. Ins. Co. v. Rhode Island Insurer'sInsolvency Fund, 811 F. Supp. 54, 57 (D.R.I. 1993) (explaining that economic legislation that does not implicate a party's fundamental rights is unconstitutional under due process clause only if it is arbitrary, discriminatory, or demonstrably irrelevant to a policy the legislature is free to adopt). Therefore, a party challenging a legislative enactment has a heavy burden to rebut the presumption that a statute is constitutional and to establish that the legislature has acted in an arbitrary and irrational manner. See Liberty Mut., 868 F. Supp. at 434 (quotingUsery v. Turner Elkhorn Mining Co.,428 U.S. 1, 15, 96 S. Ct. 2882, 2892 (1976)).
Moreover, our Supreme Court has explained that "[a]lthough a statute has retroactive effect that implicates property rights, it does not necessarily follow that the statute is unconstitutional."Brown, 659 A.2d at 103; see also Brennan529 A.2d at 640-41. Rather, the court must next examine whether the purpose of a retroactive statute is such that, on balance, it *Page 40 
outweighs the unfairness of retroactivity. SeeLawrence v. Anheuser-Busch, Inc.,523 A.2d 864, 870 (R.I. 1987); see also Raymond v.Jenard, 120 R.I. 634, 639, 390 A.2d 358, 360 (1978).
Accordingly, the Court must first determine whether the Restructuring Act is indeed retroactive in nature. A statute is unconstitutionally retroactive "[o]nly when the adverse effects of the statute are activated by events that occurred before the effective date of its enactment." Rhode Island Insurers'Insolvency Fund v. Leviton Mfg. Co., Inc.,716 A.2d 730, 735 (R.I. 1998) (citing Brown, 659 A.2d at 102). In other words, the Court must determine whether the conduct that triggers the Restructuring Act's application to the Odyssey Treaties occurred before or after the law's effective date.See id.; see also Landgraf,511 U.S. at 269-70, 114 S. Ct. at 1499 (stating that when determining whether a statute is retroactive, the Court must consider "whether the [statute] attaches new legal consequences to events completed before its enactment"). In this case, the provisions of the Restructuring Act were triggered in June 2010, eight years after its enactment. As a result, the statute's application is prospective even though it alters the provisions of a previously existing contract. SeeMcAndrews v. Fleet Bank of Mass., N.A.,989 F.2d 13, 16 (1st Cir. 1993) (holding that a statute was not retroactive, despite modifying the parties' contractual rights under preexisting contracts, where the conduct triggering the statute's application occurred after the law's effective date).
Even if the Restructuring Act were interpreted as being a retroactive legislation, having already passed constitutional muster under the Contract Clause, [28] the statute would unquestionably survive a due process challenge. See Liberty Mut.,868 F. Supp. at 434 (D.R.I. 1994) (explaining that the standard applicable to a court's review of an economic legislation under due process is less exacting than under the Contract Clause); seealso Mercado-Boneta, *Page 41 125 F.3d at 13 (noting that the Contract Clause inquiry is more searching than the rational basis review employed in a due process challenge). Indeed, when determining whether there is a rational relationship between an economic statute and a legitimate government objective, it is sufficient if any rational basis exists to support the regulation. See In re Opinion to the Governor,63 A.2d 724, 729-30 (R.I. 1949) (quoting Fritz v. Presbrey,116 A. 419, 422 (R.I. 1922) (stating that "[i]f a state of facts could exist which would justify the legislation, it is presumed that it did exist"). Consequently, where, as here, the Court has already determined that the Restructuring Act was a reasonable and necessary means by which to achieve a legitimate public purpose, it follows that a rational basis exists to support the statute sufficient to satisfy the substantive due process requirements of the United States and Rhode Island Constitutions.
Furthermore, it appears that the Odyssey Insureds also allege that the Restructuring Act and Commutation Plan's procedures are fundamentally unfair. While it is not entirely clear whether the Odyssey Insureds have raised a procedural due process challenge, the Court will nevertheless address the issue. Procedural due process, which is said to mean fair procedure, is a flexible standard, which varies depending on the nature of the interest affected and the circumstances of the deprivation. See Gorham v. Universityof R.I., 837 F.2d 7, 12 (1st Cir. 1988); see alsoCleveland Bd. of Educ. v. Loudermill,470 U.S. 532, 542, 105 S. Ct. 1487, 1493 (1985) (explaining that procedural due process ensures that notice and an opportunity to be heard precede any deprivation of a person's life, liberty, or property). The protections of procedural due process are not triggered unless a party can show that it has been deprived of a protectable liberty or property interest. See FiresideNissan, Inc. v. Fanning, 30 F.3d 206, 219 (1st Cir. 1994). Only after determining that a particular deprived interest falls within the Due Process *Page 42 
Clause, will the court examine whether the existing procedures are adequate. See Lee v. State,942 F. Supp. 750, 755 (D.R.I. 1973). Factors relevant to the Court's balancing test include:
 "The private interests affected by the state's existing procedures, risk of erroneous deprivation under them, probable utility of additional or substitute procedures and the government's interest in maintaining existing procedures, keeping in mind financial and administrative burdens of additional or substitute procedures." Id.
However, as with claims under substantive due process, a party raising a procedural due process challenge must overcome the presumption favoring the Legislature's use of its police powers.See Hoffman v. City of Warwick,909 F.2d 608, 619-20 (1st Cir. 1990) (stating that "[w]here legislature enacts general legislation eliminating statutory rights or otherwise adjusting the benefits and the burdens of economic life, in the absence of any substantive constitutional infirmity, the legislative determination provides all the process that is due").
Here, it is undisputed that the Odyssey Insureds possess a property interest created by contract. Nevertheless, the Court finds that the Restructuring Act does not violate the Odyssey Insureds' procedural due process rights. As previously articulated, the Restructuring Act provides for adequate notice and a reasonable and fair mechanism by which to commute the present and future claims of a solvent insurance company's creditors. Indeed, the Court is satisfied that by requiring that any proposed commutation plan be reviewed and approved by the DBR, the creditor-policyholders, and this Court, the Legislature has provided for sufficient safeguards to protect the property and due process interests of any party subjected to the provisions of the Restructuring Act. Additionally, as set forth above, [29] the Court finds that the Commutation Plan not only provides sufficient procedures by which to dispute actions taken *Page 43 
during the commutation process, but also protects against an adjudicator's partiality. See §§ 3.6.8 3.6.11.
Lastly, the Odyssey Insureds seem to allege that applying the Restructuring Act to them would violate due process because they lack a sufficient connection to the State. The Odyssey Insureds rely on Phillips Petroleum Co. v. Shutts, to establish that due process prohibits a state from "abrogat[ing] the rights of parties beyond its borders having no relation to anything done or to be done within them." See472 U.S. 797, 821-23, 105 S. Ct. 2965, 2979-80 (1985). Their reliance, however, is clearly misplaced. In Shutts, the Supreme Court held that Kansas courts could not apply Kansas law to disputes about natural gas royalty contracts because neither the parties nor the disputes had any connection to the State.Id. at 814-17. The Supreme Court stated, "for a State's substantive law to be selected in a constitutionally permissible manner, the State must have a significant contact or significant aggregation of contacts . . . such that choice of its law is neither arbitrary nor fundamentally unfair." Id. at 818. Here, however, the Court finds there to be sufficient connection with Rhode Island such that application of the Restructuring Act is not unfair. Although GTE RE was not domiciled in Rhode Island at the time the Odyssey Treaties were executed, GTE RE is now redomiciled in Rhode Island and entitled to invoke the laws and protections of this State. Further, as previously indicated, given the highly regulated nature of the commercial insurance industry, a legislative enactment, such as the Restructuring Act, should have been within the parties' reasonable expectations. Consequently, the Court is of the opinion that the application of the Restructuring Act — already determined to be a reasonable and necessary means of serving a legitimate public purpose — to the Odyssey Treaties is fair and would not amount to a due process violation. *Page 44 
 V Conclusion
After due consideration of all the evidence, together with the arguments advanced by counsel at the hearing and in their memoranda, the Court finds that the Odyssey Insureds have failed to establish beyond a reasonable doubt that the Restructuring Act and Commutation Plan violate the Contract Clause of the United States and Rhode Island Constitutions. The Court believes that the Restructuring Act and Commutation Plan do no substantially impair the Odyssey Insureds' contract rights. Nevertheless, even if the Court were to have found a substantial impairment, GTE RE and the State have sufficiently established that any impairment is justified by a legitimate public purpose achieved through reasonable and necessary means. Likewise, the Court finds that the Odyssey Insureds have failed to establish beyond a reasonable doubt that the Restructuring Act and Commutation Plan are not rationally related to a legitimate legislative purpose, and therefore, denies the Odyssey Insureds due process challenge. Accordingly, pursuant to § 27-14.5-4(c)(1), the Court finds that under the circumstances, and for the reasons set forth herein, the Commutation Plan does not materially adversely affect the interests of objecting creditors or the interests of assumption policyholders.
Prevailing counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] Capitalized terms, unless otherwise defined herein, have the meaning assigned to them in the Restructuring Act and Commutation Plan.
[2] Notably, in 2006, Susan F. Cogswell, Insurance Commissioner of the State of Connecticut, also established a task force to study the need for laws regulating run-off insurance companies.See April 20, 2006 Final Report of the Special Task Force on Insurance Company Run-Off and Reorganization 1. After studying the current regulation of and issues with insurance companies in run-off, the task force recommended, inter alia:
 "that laws be implemented to regulate the conduct of all run-offs. These laws should ensure that the process is conducted with transparency and fairness, and with appropriate levels of regulator oversight. They should also provide insurers that have commercial policyholders an opportunity to use court proceedings to expeditiously wind up their business with the consent of their policyholders." Id. at 4.
[3] "Reinsurance" is the pooling among secondary insurers of portions of risks previously underwritten by primary insurers in return for a reinsurance premium. See Delta Holdings,Inc. v. National Distillers Chem. Corp.,945 F.2d 1226, 1229 (2d Cir. 1991); see also 1A Steven Plitt,et al., Couch on Insurance 3d § 9:1, at 9-3 (2009). In a typical reinsurance transaction: (1) a primary insurer underwrites risks in exchange for premiums from the insureds; and (2) the primary insurer then further spreads the risk by transferring or ceding a portion of it to reinsurers in exchange for premiums.See Delta Holdings, 945 F.2d at 1229; see also
Horowitz Report § 2.2. Simply stated, reinsurance is "insurance for insurers." See Horowitz Report § 2.2; Couch onInsurance 3d § 9:1, at 9-5.
[4] "Run-off" occurs when an insurer or reinsurer ceases writing new business, but remains bound by its preexisting contractual commitments under the policies and/or reinsurance contracts into which it previously entered. See National Ass'n of Ins. Comm'rs, Alternative Mechanisms for Troubled Ins.Companies 1 (2009). As long as claims continue to be presented and the company remains solvent, the company must continue to pay claims in full. See Susan Power Johnston, Why U.S. CourtsShould Deny or Severely Condition Recognition to Schemes ofArrangement for Solvent Insurance Companies, 16 Norton J. Bankruptcy Law Prac. 953, 954-55 (Dec. 2007). A company may attempt to expedite the run-off process with consenting counterparties by offering "to commute its obligations to its insureds, exchanging early payout for cancellation of the insurer's future obligation to pay claims as they arise in the ordinary course of business." Id. "Commutations are frequently based on actuarial calculations of the present value of future claims, determined in accordance with historical claims experience."Id.
[5] "Commutation" is the "valuation, settlement, and discharge of all obligations between parties to a reinsurance contract. In return for cash, the primary insurer withdraws the liability for outstanding losses and loss adjustment expenses related to the commuted reinsurance contract." See Horowitz Report § 5.9. Under the Restructuring Act, a "commutation plan" is the mechanism by which a commercial run-off insurer commutes or extinguishes its outstanding liabilities. See
G.L. 1956 § 27-14.5-1(8).
[6] Reg. 68 was issued in accordance with § 27-14.5-6 and G.L. 1956 § 42-14-17 which empower DBR's commissioner to "promulgate rules and regulations that may be necessary to effectuate [the Restructuring Act's purpose]."
[7] To qualify as a "run-off insurer" under the Restructuring Act, an Applicant must: (1) be domiciled in Rhode Island; (2) have liabilities under policies for property and casualty lines of business; (3) have ceased underwriting new business; and (4) only be renewing ongoing business to the extent required by law or by contract. See § 27-14.5-1(21). A "commercial run-off insurer" insures or reinsures property and casualty lines of insurance.See § 27-14.5-1(6). Providers of life insurance, workers' compensation, and personal lines are expressly ineligible under the Restructuring Act. See § 27-14.5-1(21).
[8] A commutation plan submitted for review should include,inter alia, the following operative provisions: (1) explanation of the plan; (2) plan administration; (3) effect on creditor; (4) meetings of creditors; (5) Determination of classes of creditors; (6) claims procedure; (7) alternative solutions; (8) financial position; (9) actuarial review; (10) enforcement provisions; (11) determination of liabilities; (12) dispute resolution procedure; (13) payment of claims; (14) effect of insolvency; (15) termination of the plan. See
Reg. 68 § 4.
[9] Pursuant to § 27-14.5-2(c) of the Act and § 3 of Reg. 68, this Court maintains jurisdiction and venue, and is authorized to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this chapter."
[10] In those instances when notice is required, the Applicant, within ten days, must cause transmittal of the notice:
 "(1) by first class mail and facsimile to the insurance regulator in each jurisdiction in which the Applicant is doing business; (2) by first class mail to all guarantee associations; (3) pursuant to the notice provisions of reinsurance agreements or, where an agreement has no provision for notice, by first class mail to all reinsures of the Applicant; (4) by first class mail to all insurance agents or insurance producers of the Applicant; (5) by first class mail to all persons known or reasonably expected to have claims against the Applicant including all policyholders, at their last known address as indicated by the records of the Applicant; (6) by first class mail to federal, state, and local government agencies and instrumentalities as their interests may arise; and (7) by publication in a newspaper of general circulation in the state in which the Applicant has its principal place of business and in any other locations that the court overseeing the proceeding deems appropriate." Sec. 27-14.5-3(a).
"If notice is given in accordance with this section, any orders under this chapter shall be conclusive with respect to all claimants and policyholders, whether or not they received it." Sec. 27-14.5-3(b).
[11] A creditor may appeal the Chairman's decision to this Court.See Reg. 68 § 4(d). In those instances where "a Chairman's decision is reversed or altered on appeal and the vote is declared invalid, the Court may order a new Meeting of Creditors or such other relief as appropriate." Id. Additionally, all disputes between a creditor and the Applicant shall be resolved pursuant to the dispute resolution provisions specified by the commutation plan.See Reg. 68 § 4(f).
[12] Odyssey America Reinsurance Corporation (Odyssey) acts on behalf of and manages claims for its affiliates Clearwater and Hudson. See Wakin Affidavit ¶ 1.
[13] A reinsurance contract is referred to as a treaty or a reinsurance cover. See Toothman Rebuttal Actuarial Report 12 n. 2. A quota share treaty reinsures a fixed percentage of each subject policy. Id.
[14] The Hudson Treaty and Clearwater Treaty shall hereinafter be referred to as the "Odyssey Treaties."
[15] Although Rhode Island is free to provide greater constitutional protection for its citizens than the Federal Constitution mandates, our Supreme Court has yet to hold that Article I, § 12 places any greater restriction on state legislation than its federal counterpart. Brennan v. Kirby,529 A.2d 633, 637 n. 7 (R.I. 1987). Thus, this Court may rely on federal case law where appropriate. Id.
[16] The Supreme Court explained that contract expectations are important because:
 "[t]he severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." Allied Structural Steel, 438 U.S. at 245, 98 S. Ct. at 2723.
[17] Notably, under the Odyssey Treaties, Hudson's maximum coverage was capped at $4,000,000 and Clearwater's was capped at $1,500,000, of which GTE RE was responsible for only a portion. See Toothman Rebuttal Actuarial Report at 13. Hence, the Odyssey Insureds could not have had a reasonable expectation of unlimited indemnification. Furthermore, even if there was no policy cap, insurance or reinsurance policies provide no absolute guarantee of indemnification. See P.T. O'Neill J.W. Woloniecki,The Law of Reinsurance in England and Bermuda
979 (3d. ed. 2010) ("The insurer who believes that by purchasing reinsurance he has transferred part of the risk he has assumed is wrong. He has merely substituted the original risk which he underwrote for the credit risk of his insurer failing to meet his obligations."). For these reasons, it is simply a misrepresentation for the Odyssey Insureds to assert a reasonable expectation of unlimited indemnification.
[18] The survival ratio is the number of years of payments that would be covered by the reserve if payments continue at the same level as the average for the most recent five-year period.See Toothman Rebuttal Actuarial Report 7.
[19] Notably, § 99 of the Bermuda Companies Act 1981 (1981 Act) is identical in all material respects. See Bell Aff. ¶ 5. The 1975 Act was the predecessor statute to the 1981 Act and was replaced in its entirety.
[20] See In re Board of Directors of Hopewell Int'lIns. Ltd., 238 B.R. 25 (Bankr. S.D.N.Y. 1999), aff'd,274 B.R. 671 (S.D.N.Y 2002) (granting recognition to the Bermuda scheme and making its terms binding on U.S. creditors).
[21] Section 15 of Bermuda's Supreme Court Act 1905 provides:
 "Subject to the provisions of any acts which have been passed in any way altering, amending or modifying the same, and of this Act, the common law, the doctrines of equity, and the Acts of Parliament of general application which were in force in England at the date when these Islands were settled, that is to say, on the 11th day of July 1612 shall be, and are hereby declared to be, in force within Bermuda."
[22] The State's regulation of the commercial insurance industry is so pervasive that under the Insurers' Rehabilitation and Liquidation Act, G.L. 1956 § 27-14.3-1, et seq., the State has provided for the right to liquidate an insurance company, and cancel its policies, even if the insurance company is solvent.See § 27-14.3-21(3) (providing that the insurance commissioner may petition the Court for a liquidation order on the basis that "the insurer is in a condition that would make the further transaction of business hazardous, financially or otherwise, to its policyholders, its creditors, or the public").
[23] In Blue Cross/Blue Shield v. State of R.I. Dep't of Bus.Regulation, No. 04-5769, 2005 WL 1530449, at *8 (R.I. Super. Ct. June 23, 2005), this Court similarly held that the lack of existing specific regulations did not preclude a finding that the industry as a whole was heavily regulated.
[24] Notably, the Restructuring Act protects several of GTE RE's current creditors, domiciled in Rhode Island, from the risks and harmful effects of run-off. The record indicates that Constellation Reinsurance Co., Factory Mutual Insurance Company, Metropolitan Group Property and Casualty Insurance Company, and Stonewall Insurance Company are all located in Rhode Island.
[25] Despite the Odyssey Insureds' assertions that the Restructuring Act should be subject to more rigorous judicial review because the fees owed to the State provide it with a direct pecuniary interest, the Court does not believe the collection of those fees is analogous to instances in which a state has enacted legislation in order to alter its own contractual obligations. Rather, the Court finds that the $125,000 fee is necessary to assist the State in administering the provisions of the Restructuring Act, and is insufficient to trigger heightened scrutiny by this Court. See § 27-14.5-5(a) (providing that "the Applicant shall pay a fee to the department in the amount of . . . $125,000 or any lesser amount that the commissionershall deem adequate for appropriate and thorough review of theapplication") (emphasis added).
[26] The Odyssey Insureds maintain that the Restructuring Act is a drastic and unconstitutional measure because it does not merely incidentally impair contracts, but rather directly alters contractual relationships. The Court, however, finds this argument unavailing and believes the "question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end."See Blaisdell, 290 U.S. at 438, 54 S. Ct. at 240.
[27] The Due Process Clause of the Fourteenth Amendment provides that "no state shall . . . deprive any person of life, liberty, or property without due process of law." Likewise, Article 1, Section 2 of the Rhode Island Constitution states "[n]o person shall be deprived of life, liberty or property without due process of law." It is well settled, that because the Due Process Clauses of the United States and Rhode Island Constitutions are identical, the analysis under both clauses is the same.See Brown, 659 A.2d at 104.
[28] See supra Part IV.A.2-3.
[29] See supra IV.A.1.a.ii. *Page 1